Filed 7/21/14  P. v. Chico CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B243943 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA066407) |
| v. | |
| LUIS ANGEL CHICO, | |
| Defendant and Appellant. | |
| _____ | |
| In re | B251291 |
| LUIS ANGEL CHICO | |
| on | |
| Habeas Corpus. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis E. Mulcahy, Judge.  Affirmed.  Petition for writ of habeas corpus.  Denied.

Law Offices of Loren Nizinski, Loren Nizinski and Beverly Swanson for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Luis Angel Chico appeals from the judgment entered following a jury trial that resulted in his conviction for first degree murder. Chico was sentenced to a term of 50 years to life in prison.

Chico contends: (1) he was denied the effective assistance of counsel; (2) there was insufficient evidence to support his conviction; (3) his motion for a continuance of the preliminary hearing was improperly denied; and (4) his due process rights were violated when the jury saw him being led into a lockup area. He avers the trial court erred by (5) committing various instructional errors; (6) allowing the prosecutor to use improper hypothetical and other questions; (7) sustaining improper objections during defense counsel's argument; (8) failing to appoint a defense ballistics expert; (9) failing to exclude a witness from the courtroom during trial; and (10) denying his new trial motion. In a petition for a writ of habeas corpus, which we consider concurrently with his appeal, Chico reiterates many of these claims, particularly his contention that his counsel was ineffective. Discerning no prejudicial error or ineffective assistance, we affirm the judgment and deny the writ petition.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

a. *People's evidence.*

Viewed in accordance with the usual rules governing appellate review (*People v. Johnston* (2003) 113 Cal.App.4th 1299, 1303-1304), the evidence relevant to the issues presented on appeal established the following.

(i) *The shooting.*

Leonor Alvarez owned "Lucky 8 Billiards," a pool hall located on Victory Boulevard in Van Nuys. Chico and his aunt were both regular customers, and socialized with Alvarez away from the pool hall as well.

2

Rosalia Bello, who went by the nickname Sandy, and Rafael Marcos had three children together. Bello, Rafael, their children, Rafael's cousin Raul Marcos,[1] and their friend Jose Fabian Hernandez, along with other persons, lived together in a house very close to the pool hall.

On Friday, October 22, 2010, Alvarez was working at the pool hall. Vicente Martinez was bartending, and Karina Nolasco was working as a waitress. Raul, Rafael, and another cousin, Raymundo Marcos, arrived at the pool hall at approximately 9:00 p.m., and became intoxicated after drinking multiple pitchers of beer. A man passed their table, asked why Raul was looking at him, and stated that he wanted to fight him. Raul responded that he did not want to fight.

Chico arrived at the pool hall at approximately 11:30 p.m. There were between 20 and 40 people in the hall at that time, including patrons and employees. Chico socialized with his friends Claudia Briceno and Martha Martinez Vegas. Shortly after his arrival, Chico informed Alvarez she needed to remove some customers who were "fucking with him." Chico pointed out three men who were sitting at a nearby table. Chico appeared upset, and Alvarez told him to calm down. Chico told Alvarez that if she did not remove the men, "he would shoot them."

Alvarez approached the men's table and asked if everything was all right. They responded that everything was fine and they were leaving. One of them kissed Alvarez's hand as he got up. They walked towards the pool hall's Victory Boulevard exit together. As they passed Chico, the man who had kissed Alvarez's hand punched Chico in the face. Alvarez did not see who started the fight, but did see Chico return the blow. Chico pulled a revolver from his waistband and pointed it either toward the group or upwards. He seemed very angry. Alvarez grabbed Chico's hand and said, "Don't do it, Luis." He broke loose from her grasp and pushed her away. She moved away and heard, but did

---

[1]     For ease of reference, and with no disrespect, we sometimes hereinafter refer to Raul, Rafael, and Raymundo Marcos by their first names.

3

not see, a gunshot. She heard a second shot five to six seconds later. When Chico fired, the three men were "around Chico."

Waitress Nolasco, who was taking empty containers to the bar, heard a gunshot and turned to see Chico holding a gun, pointed upwards, with Alvarez next to him. She heard a second shot within a second or two. Bartender Martinez heard two shots while at the bar with his back turned. He turned around and saw Chico holding a revolver either after or simultaneously with the second shot. Chico appeared to be pointing the gun toward the ground. Raul was in the restroom when he heard one gunshot. When he emerged he saw Chico pointing a gun toward the pool hall exit. Raul did not see his cousins Rafael or Raymundo, so he headed home.

Immediately after Chico fired the shots, the pool hall patrons, including Chico, left the building through the Victory Boulevard exit. No witness reported hearing any further shots. Alvarez noted a bullet hole in the ceiling. Martinez and Alvarez, unaware that anyone had been shot, closed up the business for the night. Alvarez testified that she and Martinez left at approximately 11:50 p.m. Martinez testified that they left approximately seven minutes after the gunshots.

Hernandez and Bello were at home. Bello answered a telephone call near midnight and thereafter appeared scared and worried. Based on her statements, Hernandez exited the house to look for Rafael. Raul encountered Bello and Hernandez outside the home. He stayed with Bello while Hernandez looked for Rafael. Hernandez discovered Rafael sitting in front of a Baskin Robbins store close to the pool hall, suffering from a gunshot wound. Rafael stated, " 'I got fucked.' " Hernandez called 911, but Rafael lost consciousness and died before the ambulance arrived. While Hernandez was on the phone with 911, approximately six to seven people were still exiting the pool hall. Hernandez did not hear any gunshots while searching for Rafael.

Meanwhile, based on comments made by an unidentified man who spoke to Raul in front of the house, Raul also began searching for Rafael. When he arrived in front of the Baskin Robbins, Hernandez was already with Rafael, and Rafael was no longer speaking.

4

(ii) *The investigation.*

Officers responding to the scene found Rafael's bloody clothes in front of the Baskin Robbins store, 75 feet from the pool hall exit, where they had been cut off by paramedics treating him. There was also blood on the sidewalk in front of the Baskin Robbins and 20 feet east in the parking lot. No witness reported seeing blood in or in front of the pool hall. Police did not observe bullet casings or projectiles in the Baskin Robbins parking lot.

Telephone records showed that a call had been placed from Rafael's cellular telephone at midnight to Raul, but the call was not answered. At 12:01 a.m., there was an outgoing call from Rafael's phone to Bello that was not answered. At 12:02, there was an incoming call to Rafael's phone from Bello that was answered. Bello told Detective Peter Barba that during the call, Rafael told her he had been shot.

No witness reported seeing Rafael hit with the gunshot or reacting as if wounded in the pool hall.

The day after the shooting, Alvarez discovered several bullet fragments inside the pool hall near the entrance. She picked them up with a paper towel and placed them in a Gatorade bottle that she then hid in a box near the "boiler" at her home. When a detective interviewed Alvarez, she had her daughter retrieve the fragments and give them to him.

Forensic analysis of a bullet found in the pool hall ceiling, referred to at trial as item 17, showed the shot was fired from the back of the hall toward the front of the hall. Item 17 tested negative for the presence of blood. The bullet fragment placed in the Gatorade bottle, referred to at trial as item 18, tested presumptively positive for blood; however, such a test is not conclusive and may give false positive results. No DNA was found on item 18. Both projectiles appeared to be, or had been, jacketed hollow point bullets. Because item 17 consisted of core material only, it was not possible to determine whether the bullets were fired from same gun or were the same type of bullet.

An autopsy revealed that Rafael's fatal wound was a through-and-through gunshot wound that entered in his right lower back and exited through the front chest. The bullet

5

trajectory was from right to left, and upwards at an approximate 45-degree angle. The wound was consistent with the victim being slightly bent over at a downwards angle when he was shot. In the opinion of Dr. Vladimir Levicky, the deputy medical examiner who performed the autopsy, the shot was a close contact wound. The gun had probably been placed against the victim's clothing, and had to have been fired from a distance of less than three feet. The shot perforated the liver and the peripheral part of the right lung, which would probably have collapsed within one to two minutes. Because no major blood vessels were severed, bleeding was primarily internal. Most of the blood accumulated inside Rafael's body and was absorbed by his clothing. A victim of this type of wound would have had trouble breathing but could likely have walked or run between 75 and 125 feet before being overcome. When given a hypothetical based on the evidence presented by the People, Dr. Levicky opined that the victim could have walked or run 100 feet, made several telephone calls, and continued speaking "in the course of at least 10 to 15 minutes."

Raul and Martinez both identified Chico as the shooter in pretrial photographic lineups.

b. *Defense case.*

Bello testified that during her telephone call with Rafael, he told her to call 911, " 'because they hurt me.' " She went outside to the corner of Nagle and Victory to look for Rafael, but did not see him. She called Rafael back and he told her he was wounded on the corner. The prosecutor elicited that Rafael sounded agitated, but he was able to speak clearly.

Officer Jose Zavala testified that he observed drops of blood east of the Baskin Robbins.

Detective Barba testified that it was approximately 50 feet from the spot where Chico fired the shots to the pool hall exit door.

6

2. *Procedure.*

Trial was by jury. Chico was convicted of first degree murder (Pen. Code, § 187, subd. (a)).[2] The jury also found Chico personally and intentionally discharged a firearm, causing Rafael's death (§ 12022.53, subd. (d)). The trial court denied Chico's motion for a new trial, brought on a variety of grounds. It sentenced him to a term of 50 years to life in prison, ordered him to pay victim restitution, and imposed a restitution fine, a suspended parole restitution fine, a court operations assessment, and a criminal conviction assessment. Chico appeals.

DISCUSSION

1. *Denial of pretrial motion for a continuance.*

The morning the preliminary hearing was set to commence, defense counsel moved for a continuance on the grounds he needed (1) English transcriptions of police interviews of Spanish-speaking witnesses, (2) appointment of a defense ballistics expert to analyze the bullet fragments, and (3) appointment of a defense DNA expert. The prosecutor objected that there was no good cause for a continuance because among other things, he did not intend to introduce ballistics or DNA evidence at the preliminary hearing. The prosecutor's witnesses were present and ready to testify, and the trial court had already continued the preliminary hearing four times at the defense's request. The trial court denied the motion.

After Chico was held to answer, defense counsel filed a section 995 motion to set aside the information on the ground that the court's denial of a continuance deprived him of the right to present a defense at the preliminary hearing. The trial court apparently denied the section 995 motion.

In a cursory argument, Chico contends denial of the continuance violated his due process rights. He theorizes that, had defense counsel had an opportunity to review the evidence in question, he could have demonstrated there was a lack of probable cause to

---

[2] All further undesignated statutory references are to the Penal Code.

hold him over for trial.

This claim lacks merit. It is well settled that when "a defendant after conviction asserts error at the preliminary hearing, the defendant must 'show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination.' [Citation.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 158-159; *People v. Pompa-Ortiz* (1980) 27 Cal. 3d 519, 529; *People v. Carrington* (2009) 47 Cal.4th 145, 178; *In re Wright* (2005) 128 Cal.App.4th 663, 673-674.) Chico has not met this standard here. Even assuming arguendo that the trial court erred by denying the continuance and section 995 motion, Chico has not demonstrated that he suffered any prejudice as a result. The record reveals no basis to believe that counsel's further examination of the materials in question would have enabled him to demonstrate the absence of probable cause.

2. *The evidence was sufficient to support the verdict.*

Chico contends the evidence was insufficient to support the jury's first degree murder verdict in that (1) there was no evidence he fired the shot that killed Rafael; (2) there was no evidence of malice; and (3) there was no evidence of premeditation and deliberation. We disagree.

a. *Applicable legal principles.*

The applicable standard of review is well settled. In assessing a claim of insufficiency of the evidence, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66; *People v. Elliott* (2012) 53 Cal.4th 535, 585.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Zamudio* (2008) 43 Cal.4th 327, 357.) The same

8

standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence. (*People v. Brown* (2014) 59 Cal.4th 86, 106.)

   b. *There was sufficient evidence to prove Chico filed the fatal shot.*

   Viewing the evidence in the light most favorable to the verdict (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653), the evidence was sufficient to prove Chico fired the shot that killed Rafael. There was ample evidence Chico fired two shots in the pool hall, as set forth *ante*. There was also evidence the three men, inferentially the Marcos cousins, were standing around Chico when he shot. Rafael was found fatally wounded in front of the Baskin Robbins store minutes later. No witness saw any other person fire a gun, or in possession of a gun, and no witness heard any further shots. Alvarez recovered bullet fragments inside the pool hall, one of which tested presumptively, though not conclusively, positive for blood. From these facts, the jury could reasonably have inferred Chico shot Rafael.

   Chico makes a variety of arguments in support of his insufficiency claim. He urges that: (1) "[n]o one saw him shoot, and certainly no one saw him shoot Rafael"; (2) the fatal wound was a contact wound inflicted from a distance of less than three feet, but no witness testified to seeing Rafael within three feet of Chico when the shots were fired; (3) there was no blood in the pool hall; (4) no evidence showed the two bullet fragments were fired from the same gun; (5) no DNA was discernable on either bullet fragment; (6) the finding of blood on one of the bullet fragments was "speculative"; (7) no witness testified that Rafael behaved as if he had been shot when exiting the pool hall; (8) blood drops were found "185 feet" away from the pool hall, an unreasonable distance for Rafael to have travelled given the nature of his wounds; (9) Rafael called his wife at 12:01 a.m., over 10 minutes after the shots were fired, an unreasonably long lapse if he had been shot inside the pool hall; and (10) Alvarez's testimony that Chico said he would shoot if she did not remove the other men was inadmissible hearsay and should have been considered with suspicion under CALCRIM No. 358.

   None of the circumstances cited by Chico demonstrates the evidence was insufficient as a matter of law. Jurors could have reasonably inferred that Chico was the

9

shooter from the evidence presented, even though the witnesses who testified at trial only heard, but did not see, the gun fire, and did not see the shot hit Rafael. Circumstantial evidence is sufficient to prove guilt. (*People v. Jones* (2013) 57 Cal.4th 899, 961.)

That the trial witnesses did not see Rafael staggering or bleeding does not demonstrate he was shot outside the pool hall by someone other than Chico. The witnesses were focused on Chico, and would not necessarily have seen Rafael's reactions as he made his way out the exit. Nor did the evidence preclude the conclusion Chico shot Rafael at close range. Nolasco testified that although no one was standing directly in front of Chico when the second shot was fired, people were standing around him. Martinez testified that he did not remember whether anyone was within three feet of Chico when he heard the shots; at the preliminary hearing, he testified that the closest person was about three feet away, within the range of Dr. Levicky's estimate for a contact wound. Alvarez testified at trial that "[e]verybody was in front of" Chico, and "[t]here were many people" "standing together" with him and "surrounding him." Thus, the jury was not obliged to accept the argument that Chico was too far away to have been the killer. The absence of blood in the pool hall was explained by medical examiner Levicky's testimony, as set forth *ante;* additionally, Detective Barba testified that it is not unusual for shooting victims to walk or run hundreds of feet from the shooting site without leaving a blood trail. Dr. Levicky also testified that a victim of wounds like Rafael's would likely have been able to walk or run a considerable distance, between 75 and 125 feet, before being overcome, and would have been able to make "two or three phone calls, and speak words to the effect of what happened to him . . . in the course of at least 10 to 15 minutes." In any event, the conclusion that Rafael's calls home were placed 10 minutes after the shooting is based solely on Alvarez's estimate that she left the pool hall at "around 11:50." Raul, on the other hand, left the pool hall immediately after the shots were fired and went home. He testified that the pool hall was almost directly across the street from his home, which was located "one . . . residence" south of Victory

10

and therefore could have been traversed in a minute or two.[3]  When Raul arrived at his residence, Bello was already outside with Hernandez, demonstrating Bello had already spoken to Rafael on the telephone.  Additionally, Hernandez testified that people were still leaving the pool hall when he was tending to Rafael in front of the Baskin Robbins.  Based on this evidence, jurors could have concluded Chico fired the gunshots closer to midnight, and there was not an unexplained delay between the shots and Rafael's calls home.

Alvarez's testimony about Chico's statement that he would shoot if she did not remove the other patrons was not inadmissible hearsay, because it fell within the hearsay exception for party admissions.  (Evid. Code, § 1220 ["Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . ."].)  CALCRIM No. 358, which was given to the jury, provides that a defendant's non-recorded out-of-court statement tending to show guilt must be viewed with caution.  CALCRIM No. 358 does not preclude the use of such statements, however.  It is axiomatic that the jury may still rely on such statements when determining guilt.

Finally, the absence of DNA evidence, the fact the blood test was not conclusive, and the absence of a showing both bullet fragments were shot from the same gun, while no doubt helpful facts for the defense, do not demonstrate the evidence was insufficient.

In sum, Chico's arguments "merely presented the jury with a credibility determination that is not reviewable on appeal."  (*People v. Mejia* (2007) 155 Cal.App.4th 86, 99.)  It is not the function of an appellate court to reweigh the evidence or resolve evidentiary conflicts.  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)  "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment . . . ."  (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

---

[3]     Raul explained:  "My house is on Nagle.  All I have to do is cross Victory to be at the pool hall."

11

c. *There was sufficient evidence to prove malice.*

Chico next contends the evidence was insufficient to prove malice. He is incorrect. Murder is an unlawful killing committed with malice aforethought. (§ 187, subd. (a); *People v. Robertson* (2004) 34 Cal.4th 156, 164, disapproved on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) "Malice may be express or implied. Malice is express 'when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.' (§ 188.)" (*People v. Robertson, supra,* at p. 164; *People v. Knoller* (2007) 41 Cal.4th 139, 151.) It is implied when the killing results from an intentional act, the natural consequences of which are dangerous to life, deliberately performed by a person acting with knowledge of the danger to, and with conscious disregard for, human life. (*Knoller*, at p. 143; *People v. Cook* (2006) 39 Cal.4th 566, 596.) When it is established that the killing was the result of an intentional act committed with implied malice, no other mental state need be shown in order to establish malice aforethought. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 103.)

Here, the evidence was sufficient to prove both express and implied malice. Chico pulled out a gun after being punched, and resisted Alvarez's attempts to dissuade him from shooting. He then fired two shots. From this, jurors could infer he intended to kill. Jurors could also readily find that his actions of shooting two shots in a crowded pool hall manifested a conscious disregard for human life, proving implied malice.

Chico complains that there was "no direct evidence of malice aforethought." But direct evidence was not required. "Mental state and intent are rarely susceptible of direct proof and must therefore be proven circumstantially." (*People v. Thomas* (2011) 52 Cal.4th 336, 355; *People v. James* (1998) 62 Cal.App.4th 244, 277 [" 'Implied malice, like all other elements of a crime, may be proven by circumstantial evidence' "].) Chico's arguments that his shots were accidental, and that he lacked malice because he acted in the heat of passion, were questions for the jury and do not demonstrate an evidentiary insufficiency. (See *People v. Mejia, supra,* 155 Cal.App.4th at p. 99; *People v. Young, supra,* 34 Cal.4th at p. 1181.)

12

d. *There was sufficient evidence to prove premeditation and deliberation.*

Next, Chico urges that the evidence was insufficient to prove premeditation and deliberation. A murder that is premeditated and deliberate is murder of the first degree. (§ 189; *People v. Burney* (2009) 47 Cal.4th 203, 235.) Premeditation and deliberation require more than a showing of intent to kill. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419; *People v. Concha* (2010) 182 Cal.App.4th 1072, 1083-1084.) An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection, rather than as the product of an unconsidered or rash impulse. (*Burney*, at p. 235; *People v. Jurado* (2006) 38 Cal.4th 72, 118.) "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 767; *People v. Solomon* (2010) 49 Cal.4th 792, 813.)

A reviewing court normally considers three types of evidence when determining whether a finding of premeditation and deliberation is adequately supported: planning activity by the defendant; motive; and the manner of killing. (*People v. Gonzalez, supra*, 54 Cal.4th at pp. 663-664; *People v. Burney*, *supra,* 47 Cal.4th at p. 235; *People v. Romero* (2008) 44 Cal.4th 386, 401; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) These so-called "*Anderson*" factors are not the exclusive means to establish premeditation, and need not be present in any particular combination, or at all, to establish the evidence was sufficient.[4] (*Gonzalez,* at p. 663; *Burney*, at p. 235; *People v. Tafoya* (2007) 42 Cal.4th 147, 172.) "A first degree murder conviction will be upheld when there is extremely strong evidence of planning, or when there is evidence of motive with evidence of either planning or manner." (*Romero*, at p. 401.)

Here, there was some evidence establishing all three factors. Chico told Alvarez

---

[4] Contrary to Chico's suggestion, a prior relationship with the victim is not required, nor is it one of the *Anderson* factors.

he would shoot the men who had been bothering him if she did not remove them from the pool hall, demonstrating planning as well as motive. Chico's refusal to heed Alvarez's pleas not to shoot, and the fact he either inflicted a contact wound or fired from very close range, into the victim's back, sufficed to show the manner of killing demonstrated premeditation. While in our view the evidence was not overwhelming, it was sufficient.

Chico argues that there was no direct evidence of premeditation; Alvarez's testimony that he said he would shoot the men was unbelievable; even if her testimony on this point was credited, his statement was merely an emotional reaction and no reasonable juror could have taken it literally; and in any event, the statement indicated he "was attempting to follow some protocol to keep matters civilized rather than just shooting." Chico also urges that once Alvarez asked the men to leave, "a new time period began with a new unpremeditated immediate reaction on Chico's part." Again, these arguments simply ask us to reweigh the evidence and substitute our judgment for the jury's. That we cannot do. The fact the evidence might have been reconciled with a contrary finding does not warrant a reversal. (See, e.g., *People v. Livingston* (2012) 53 Cal.4th 1145, 1170; *People v. Tripp* (2007) 151 Cal.App.4th 951, 955.)

3. *The trial court did not commit instructional error.*

The trial court instructed the jury on first and second degree murder, and on voluntary manslaughter based on heat of passion and provocation. The defense requested that the court also instruct on self-defense and on voluntary manslaughter on an imperfect self-defense theory. The trial court declined to give these instructions because there was no substantial evidence to support them. Chico contends the trial court's omission was prejudicial error. Further, he posits that an instruction on " 'accidental homicide' " should have been given sua sponte, even though the defense did not request it.

a. *Applicable legal principles.*

A trial court must instruct, sua sponte, on the general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case. (*People v. Moye* (2009) 47 Cal.4th 537, 548; *People v. Abilez* (2007) 41 Cal.4th 472, 517; *People v. Breverman* (1998) 19 Cal.4th 142, 154.)

14

Instructions on a defense or lesser included offense must be given only when there is substantial evidence from which the jury could conclude the defendant is guilty of the lesser offense. (*People v. Thomas* (2012) 53 Cal.4th 771, 813; *People v. Manriquez* (2005) 37 Cal.4th 547, 584; *People v. Johnson* (2009) 180 Cal.App.4th 702, 707.) Substantial evidence is evidence that a reasonable jury could find persuasive. (*People v. Benavides* (2005) 35 Cal.4th 69, 102.) In deciding whether substantial evidence exists, we do not evaluate the credibility of the witnesses, a task for the jury. (*Manriquez*, at p. 585.) The duty to instruct sua sponte on lesser included offenses is not satisfied by instructing on only one theory of an offense if other theories are supported by the evidence. (*People v. Lee* (1999) 20 Cal.4th 47, 61.) We independently review the question of whether the trial court erred by failing to instruct on a defense or a lesser included offense. (*People v. Booker* (2011) 51 Cal.4th 141, 181; *People v. Oropeza* (2007) 151 Cal.App.4th 73, 78.) Doubts about the sufficiency of the evidence to warrant an instruction should be resolved in the defendant's favor. (*People v. Moye, supra,* 47 Cal.4th at p. 562; *People v. Tufunga, supra,* 21 Cal.4th at p. 944.)

Voluntary manslaughter is the intentional but nonmalicious killing of a human being, and is a lesser offense of murder. (*People v. Moye, supra*, 47 Cal.4th at p. 549; *People v. Benavides, supra*, 35 Cal.4th at p. 102; § 192, subd. (a); *People v. Lee, supra,* 20 Cal.4th at p. 59.) A killing may be reduced from murder to voluntary manslaughter if it occurs upon a sudden quarrel or in the heat of passion on sufficient provocation, or if the defendant kills in the unreasonable, but good faith, belief that deadly force is necessary in self-defense. (*People v. Manriquez*, *supra,* 37 Cal.4th at p. 583; *Lee*, at pp. 58-59.) Homicide is justifiable when committed in "perfect" self-defense. (§ 197, [¶] 1; *People v. Elmore* (2014) 59 Cal.4th 121, 133-134.)

b. *The trial court did not err by omitting instructions on self-defense and imperfect self-defense.*

A defendant acts in self-defense when he (1) reasonably believed he was in imminent danger of suffering bodily injury; (2) reasonably believed that the immediate use of force was necessary to defend against that danger; and (3) used no more force than

15

was reasonably necessary to defend against that danger.  (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 49-50; *People v. Lee* (2005) 131 Cal.App.4th 1413, 1427; *People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1261; CALCRIM No. 505.)  When deciding whether the defendant's beliefs were reasonable, all the circumstances "as they were known to and appeared to the defendant" must be considered.  (CALCRIM No. 505.)  "To require instruction on [self-defense], there must be evidence from which the jury could find that appellant actually had such a belief.  This evidence may be present even though appellant did not testify or make a statement admitted at trial." (*Viramontes*, at p. 1262.)  Imperfect self-defense is the killing of another human being under the actual but unreasonable belief that the killer was in imminent danger of death or great bodily injury.  (*People v. Booker, supra*, 51 Cal.4th at p. 182; *People v. Cruz* (2008) 44 Cal.4th 636, 664.)  It likewise requires evidence the defendant acted due to an actual belief he was in imminent danger.  (*People v. Elmore, supra,* 59 Cal.4th at p. 134.)

Chico contends there was substantial evidence to support instructions on self-defense and imperfect self-defense because Rafael's group was intoxicated and antagonistic; one of them punched him in the face without provocation; and Alvarez told police the men attacked Chico " 'with a fury.' "  However, there was no evidence *Rafael* hit Chico.  There was also no evidence Chico fired because he believed he was in imminent danger.  No evidence suggested anyone other than Chico had a weapon, or that Chico believed anyone did.  Chico's use of deadly force in response to a fistfight defeats any claim of self-defense, perfect or imperfect.  As *Lee* explained, a defendant who kills during a sudden quarrel or "mutual combat" "may not take undue advantage" by using deadly force against an unarmed victim.  (*People v. Lee, supra*, 20 Cal.4th at p. 60, fn. 6.)  "[I]n case of mutual combat, in order to reduce the offen[s]e from murder to manslaughter, it must appear that the contest was waged upon equal terms, and no undue advantage was sought or taken by either side; for, if such was the case, malice may be inferred, and the killing amount to murder." (*People v. Sanchez* (1864) 24 Cal. 17, 27.)

The evidence showed one of Rafael's companions punched Chico in the face.  There was conflicting evidence regarding whether Chico punched back, and whether

16

others in Rafael's group joined the fray. Chico was privileged to use similar force and strike back, but nothing in the record suggests he could reasonably have believed deadly force was necessary. There was no showing Rafael's group was armed with a deadly weapon, or that Chico believed they were. There was no showing the other men were in a position to inflict mortal wounds during the fistfight. There was no evidence Chico believed, reasonably or unreasonably, that deadly force was necessary. Thus, the evidence showed Chico took undue advantage by suddenly using a gun in a fistfight against unarmed victims. (*People v. Lee, supra,* 20 Cal.4th at p. 60, fn. 6; *People v. Valencia* (2008) 43 Cal.4th 268, 288, fn. 6 [if a defendant unreasonably believed the victim "was going to punch him in the arm and stabbed him to death in response, this belief would not support a claim of imperfect self-defense for the reason that the belief, even if reasonable, would not permit the use of deadly force"]; *People v. Johnston, supra*, 113 Cal.App.4th at p. 1313.) Under these circumstances, the requested instructions were properly declined. (*People v. Burney, supra*, 47 Cal.4th at p. 246; *People v. Young, supra,* 34 Cal.4th at p. 1200 [court need not instruct based on conjecture or speculation]; *People v. Johnson, supra,* 180 Cal.App.4th at p. 707.)

    c. *Accident.*

Chico also avers that the trial court should have sua sponte instructed on accident, and his counsel was ineffective for failing to request the instruction. He argues that he fired the first shot into the ceiling accidentally, and "[t]he only logical" conclusion was that he fired the second shot accidentally as well.

A defendant is not guilty if he or she committed a crime accidentally. (§ 26; *People v. Anderson* (2011) 51 Cal.4th 989, 996; CALCRIM No. 3404.) An instruction on the defense of accident is a pinpoint instruction, and a trial court has no duty to give it sua sponte. (*Anderson*, at pp. 996-997.) Nor did defense counsel perform inadequately by failing to request the instruction. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Homick* (2012) 55 Cal.4th 816, 893, fn. 44.) No substantial evidence supported the instruction. Alvarez testified that she pleaded with Chico not to shoot and attempted to grab the gun. However, "he got loose" because he was stronger than she was. She

17

heard the first shot "that very moment when he got loose." She "had already let go" when she heard the first shot, and heard the second shot within five to six seconds thereafter. Other witnesses testified the gunshots came approximately one to two seconds apart. Thus, the evidence showed Alvarez and Chico were *not* struggling over the gun when he fired the second shot. Moreover, the fact he fired a *second* shot seconds after the first suggests the second, fatal shot was not accidental. The theory that the fatal shot was accidental was speculative and insufficient evidence supported an accident instruction. (See *People v. Young, supra,* 34 Cal.4th at p. 1200; cf. *People v. Mendoza, supra,* 24 Cal.4th at p. 174.)

Moreover, even if omission of the accident instruction was error, it was harmless. A trial court's failure to instruct is harmless if the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. (*People v. Wright* (2006) 40 Cal.4th 81, 98-99; *People v. Sojka* (2011) 196 Cal.App.4th 733, 738; cf. *People v. Castaneda* (2011) 51 Cal.4th 1292, 1359-1360.) The jury found Chico acted with deliberation and premeditation, necessarily finding he harbored the intent to kill. This state of mind was inconsistent with a finding Chico fired accidentally. (Cf. *People v. Wharton* (1991) 53 Cal.3d 522, 572; *People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) Thus, it is not reasonably probable Chico would have obtained a more favorable result had the jury been instructed on accident.

4. *Failure to exclude Bello from the courtroom.*

Prior to the presentation of evidence, the prosecutor requested that Bello be allowed to remain in the courtroom during trial. He represented that the People did not intend to call her as a witness in their case-in-chief, and she was not a material witness to the actual shooting. Defense counsel stated that he might call Bello as a witness, and moved to exclude her pursuant to Evidence Code section 777.[5] Defense counsel

---

[5] Evidence Code section 777, subdivision (a), provides: "Subject to subdivisions (b) and (c), the court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses."

18

explained: "I don't want her to listen to anyone else's testimony as to what occurred. I don't want the jurors seeing her there everyday and then seeing her on the stand . . . because they have seen her for two or three days straight, they're going to give her more credibility." The trial court denied Chico's request, reasoning that Bello's presence at trial would not be prejudicial to the defense case. The court granted the defense motion to exclude all other witnesses.

In a cursory argument, Chico contends the court's ruling was an abuse of discretion. It was not. Section 1102.6, subdivision (a) provides that a victim "shall be entitled to be present and seated at all criminal proceedings where the defendant, the prosecuting attorney, and the general public are entitled to be present." When the victim is deceased, the statutory definition of "victim" includes members of the victim's immediate family. (§ 1102.6, subd. (c).) A victim who is subpoenaed as a witness may nonetheless be excluded from trial pursuant to Evidence Code section 777 if there is a substantial probability that the defendant's right to a fair trial will be prejudiced by the victim's presence at trial. (§ 1102.6, subds. (b), (d); *People v. Tully* (2012) 54 Cal.4th 952, 1005-1006.) The substantial risk must be "real, not speculative or hypothetical." (*Tully*, at p. 1006.) The exclusion of witnesses from the courtroom pursuant to Evidence Code section 777 is a matter within the trial court's discretion. (*People v. Valdez* (1986) 177 Cal.App.3d 680, 687.) The purpose of the exclusion is to prevent tailored testimony and aid in the detection of less than candid testimony. (*Ibid.*) We review a trial court's decision under section 1102.6 and Evidence Code section 777 for abuse of discretion. (*Tully*, at p. 1004; *People v. Wallace* (2008) 44 Cal.4th 1032, 1053.)

It is not clear whether Bello and Rafael were actually married. Bello testified she and Rafael were married, but Detective Barba testified she may have told him they were not formally married. Either way, however, the trial court's order was not an abuse of discretion. The defense, not the People, called Bello as a witness. Bello was not a witness to the shooting; she was at her home at the time Rafael was shot. Her testimony pertained only to Rafael's telephone call to her after the shooting, and the ensuing search for him. There was no material dispute about the timing of the phone calls or the

19

discovery that Rafael was lying wounded in front of the Baskin Robbins. Given the limited nature of Bello's testimony, there was no risk her presence at trial could have affected her, or any other witness's, testimony. (See *People v. Tully, supra,* 54 Cal.4th at p. 1006; *People v. Bradford* (1997) 15 Cal.4th 1229, 1322.) Defense counsel's mere assertion to the contrary was " 'insufficient to support a claim that the trial court abused its discretion.' " (*Tully*, at p. 1006.) Chico's additional argument that her presence likely "discouraged" defense counsel from exploring various topics is entirely speculative and unsupported by any specific evidence. "This is simply not enough to show an abuse of discretion by the trial court." (*Ibid*.)

5. *Denial of Chico's motion for appointment of a ballistics expert.*

Prior to the preliminary hearing, defense counsel moved for the appointment of a ballistics expert who could examine the bullet and bullet fragment, items 17 and 18, found in the pool hall. The motion stated that the police department did not intend to have these items examined by an expert; appointment of the expert was "necessary for defense counsel to properly defend" the case; and Chico "adamantly denie[d]" shooting the victim. The request was denied for reasons that are not disclosed in the record. As noted, defense counsel orally reiterated this request at the preliminary hearing. The record before us does not contain further discussion of the expert appointment issue. Chico contends that the trial court prejudicially erred by failing to appoint a ballistics expert for the defense. We disagree.

Due process, as well as the right to effective assistance of counsel, entitles an indigent defendant to access to public funds for reasonably necessary expert services. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1085, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151; *Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 319 (*Corenevsky*); *People v. Stuckey* (2009) 175 Cal.App.4th 898, 915; *People v. Gaglione* (1994) 26 Cal.App.4th 1291, 1303-1304, disapproved on another ground in *People v. Martinez* (1995) 11 Cal.4th 434, 452; *People v. Young* (1987) 189 Cal.App.3d 891, 902-903; see generally *Ake v. Oklahoma* (1985) 470 U.S. 68, 77.)

20

Evidence Code sections 730[6] and 731 authorize the trial court to appoint an expert to render advice and to testify as a witness at public expense. (*Gaglione*, at pp. 1303-1304.)

"However, it is only *necessary* services to which the indigent defendant is entitled, and the burden is on the defendant to show that the expert's services are necessary to his defense." (*People v. Gaglione, supra,* 26 Cal.App.4th at p. 1304; *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1255; *People v. Guerra, supra,* 37 Cal.4th at p. 1085.) Appointment is necessary where the expert will address an issue likely to be a significant factor at trial, will respond to the prosecution's expert witnesses, or will establish an affirmative defense. (*People v. Stuckey, supra,* 175 Cal.App.4th at p. 918.) To make the requisite showing a defendant must advise the trial court of the " ' "general lines of inquiry he wishes to pursue, being as specific as possible." ' " (*Corenevsky*, *supra,* 36 Cal.3d at p. 320.) "Although such motions can be granted only if supported by a showing that the investigative services are reasonably necessary [citation], it has been recognized that because of the early stage at which the request typically arises, it will often be difficult for counsel to demonstrate a clear need for such funds. [Citation.] Therefore the trial court should, in appropriate circumstances, 'view with considerable liberality a motion for such pre-trial assistance.' [Citation.]" (*Ibid.*; *People v. Hajek and Vo,* at p. 1255; *Guerra*, at p. 1085.) The court has discretion in determining whether appointment of an expert is necessary, and we review its ruling for abuse. (*Guerra*, at p. 1085; *Gaglione*, at p. 1304.)

Here, the record does not disclose the basis for the court's ruling denying the defense request, making it difficult for this court to review the rationale for the denial.

---

[6]     Evidence Code section 730 provides in pertinent part:  "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required."

Certainly the issue of whether the bullet fragment found by the pool hall door was the shot that killed Rafael was of crucial importance to the case. Chico's motion did not divulge the reasons for the appointment request, except for the conclusory assertions that he did not commit the killing and the expert was necessary for a proper defense. However, as the motion was filed early in the case, it may have been difficult for counsel to be highly specific and the motion should have been viewed liberally. (*People v. Hajek and Vo, supra,* 58 Cal.4th at p. 1255; *Corenevsky, supra,* 36 Cal.3d at p. 320.)

However, assuming arguendo the motion made the requisite showing and the court erred by denying it, we discern no prejudice to Chico under any standard. There was no real dispute that Chico fired the shot that entered the pool hall's ceiling, item 17. There was no evidence or argument that item 17 hit the victim. Further analysis of item 17, therefore, would have neither added to the defense case nor undercut the People's case.

Item 18 was found near the pool hall door and recovered by Alvarez, and consisted of two fused pieces that were once a single projectile. It was undisputed that No. 18 was fired from inside the pool hall. There were only two exculpatory arguments the defense could have made in regard to item 18: either (1) item 18 was not the bullet that struck the victim; or (2) Chico did not fire the shot that expelled item 18. As to the first argument, it is difficult to see how further ballistics testing could have assisted the defense. Alvarez moved the fragments and put them in the Gatorade bottle before police or any expert could examine their location. Therefore, ballistics analysis could not have shed light on, for example, item 18's trajectory. Chico does not advance any persuasive theory as to how ballistics testing could have assisted the defense in proving item 18 was not the fatal bullet.

As to the second potential argument, the People's expert testified that the bullet lodged in the ceiling, item 17, consisted of a lead core that had shed its jacket. Therefore, it was not possible to determine whether items 17 and 18 were fired from the same gun. Moreover, no gun was ever recovered in the case. Given that the condition of the projectiles precluded such a finding, there is no reason to believe a second expert could have shed more light on the question. The People's expert was also unable to determine

22

with certainty whether items 17 and 18 were the same type of bullet. He did opine that item 18 could have been fired from a revolver, the type of gun witnesses saw Chico holding, and both items 17 and 18 appeared to be jacketed hollow point bullets. This evidence provided limited support for the People's theory that Chico fired both shots.

However, it is highly unlikely additional expert testimony could have persuaded the jury Chico fired only the first shot. The evidence Chico fired both shots inside the pool hall was overwhelming. Martinez and Nolasco heard gunshots one to two seconds apart and saw Chico holding the gun after the second shot. Alvarez saw Chico with the gun, attempted to prevent him from firing, moved away, heard the first shot, and heard a second shot within five to six seconds. There was no evidence that anyone other than Chico possessed or fired a gun inside the pool hall. No witness testified that Chico handed the gun off to a second person, or that more than two shots were heard in the pool hall. Under these circumstances, it is clear beyond a reasonable doubt that even if the defense had been able to martial expert testimony that items 17 and 18 were different types of bullets, this evidence would not have persuaded the jury that Chico fired only the first shot.

Chico's contentions that expert testimony would have been "helpful and important" to demonstrate "the significance of the bullets" and "questions regarding causation," are conclusory and not persuasive. Chico provides no explication for his contention that a ballistics expert could have shed light on any "outstanding questions" regarding the chain of custody of items 17 and 18. Chico fails to explain how a ballistics expert could have opined regarding the "lack of DNA " and "blood evidence," as these topics would not have been within a ballistics expert's area of expertise. Accordingly, denial of the defense motion was manifestly harmless. For the same reasons, we reject Chico's argument that his counsel was ineffective for failing to seek writ review of the trial court's denial of the motion. (*People v. Mai* (2013) 57 Cal.4th 986, 1009; *Strickland v. Washington, supra,* 466 U.S. at p. 694.)

6. *View of Chico "in custody."*

During the People's case-in-chief, the trial court announced that the building was being evacuated, and excused the jury. The next court day, defense counsel moved for a mistrial. Counsel stated that when the court had been speaking to a courtroom deputy about the need to evacuate, "a second deputy came into the courtroom and in front of the jurors stood behind Mr. Chico and started to order him to get up from the seat so he [could] be taken back to lock up." Defense counsel asked the deputy to wait, but the deputy stated he had to take Chico "now." According to counsel, the deputy escorted Chico to approximately four feet from the lockup area. At that point the trial court observed what was happening and ordered the deputy to stop. The deputy and Chico stood in place while the jurors evacuated. Defense counsel averred that Chico suffered incurable prejudice. The trial court disagreed. It observed that the lockup door was never opened, the jurors did not see Chico taken into lockup, and Chico had only moved four or five steps from his chair. The deputy did not have his hands on Chico, and Chico was not handcuffed or placed in any type of restraint. Accordingly, the trial court denied the motion. Chico contends that as a result of the foregoing, the jury improperly viewed him in custody. This contention lacks merit.

A trial court " 'has broad power to maintain courtroom security and orderly proceedings.' " (*People v. Stevens* (2009) 47 Cal.4th 625, 632; *People v. Sanchez* (2011) 200 Cal.App.4th 70, 76.) Its decisions to employ security measures in the courtroom are reviewed for abuse of discretion. (*People v. Hernandez* (2011) 51 Cal.4th 733, 741; *Stevens*, at p. 632.) "Many courtroom security procedures are routine and do not impinge on a defendant's ability to present a defense or enjoy the presumption of innocence. [Citation.] However, some security practices inordinately risk prejudice to a defendant's right to a fair trial and must be justified by a higher showing of need. For example, visible physical restraints like handcuffs or leg irons may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community. [Citations.] Because physical restraints carry such risks, their use is considered inherently prejudicial and must be

justified by a particularized showing of manifest need. [Citations.]" (*Hernandez*, at pp. 741-742; *Stevens*, at pp. 632-633; *People v. Soukomlane* (2008) 162 Cal.App.4th 214, 229.) However, the "stringent showing required for physical restraints like shackles is the exception, not the rule. Security measures that are not inherently prejudicial need not be justified by a demonstration of extraordinary need." (*Stevens*, at p. 633.) Our Supreme Court has "consistently upheld the stationing of security or law enforcement officers in the courtroom." (*Id.* at p. 634; *Sanchez*, at p. 77.) Likewise, stationing a uniformed deputy at the witness stand during the defendant's testimony is not inherently prejudicial. (*Hernandez*, at p. 742; *Stevens*, at p. 638.)

Applying the foregoing principles here, we discern no abuse of discretion or violation of Chico's constitutional rights. First, the deputy's action of having Chico stand, and directing him to move several feet away from his seat, was not the equivalent of shackling. Chico was not handcuffed or shackled, nor was he physically restrained by the deputy. Chico did not enter the lockup area while the jury was present, and the lockup door was not opened. Second, Chico was not singled out. The jurors were also ordered about. The court initially requested that the jurors leave the courtroom; on their way out, the jurors were ordered to stop while a deputy gathered more information; the court then asked them to move into the hall; and they were finally escorted downstairs by another deputy. Given the situation, the deputy's actions could not have affronted Chico's dignity, or undermined the presumption of innocence by suggesting he was dangerous. (See *People v. Hernandez, supra,* 51 Cal.4th at pp. 745-746.) Contrary to Chico's assertions, nothing in the record remotely suggests Chico was intimidated, that the deputy's actions appeared "ominous" or had any "psychological effect" on jurors, or that Chico's participation in his defense was impaired. Third, even if the deputy's brief escort of Chico is considered potentially prejudicial, it was justified by manifest need. The courthouse was being evacuated, presumably due to an emergency. In such an evacuation, quick action was necessary to ensure the safety of the jury, court staff, and Chico himself. Fourth, even assuming arguendo that the deputy's action was erroneous, it was not reasonably probable Chico would have obtained a more favorable result absent

the error. (*Id*. at pp. 745-746 [security procedures that are not inherently prejudicial evaluated under *People v. Watson* (1956) 46 Cal.2d 818].) The deputy's action was benign and, for the reasons we have discussed, would not have undermined the presumption of innocence or somehow prejudiced Chico.

In his declaration in support of his habeas petition, Chico states that he "believe[s]" he was handcuffed by the deputy in view of the jury, and that afterwards jurors avoided eye contact and no longer smiled at him. Chico's assertion is contradicted by the statements of the court and the courtroom deputy. Moreover, it is inconceivable that, had Chico been handcuffed, defense counsel would have omitted that fact when moving for a mistrial. Given that the trial court has, for all practical purposes, already made a finding Chico was not handcuffed, Chico's assertion to the contrary does not establish he is entitled to relief.

7. *Challenges to various hypothetical questions and testimony.*

Chico next complains about several questions posed by the prosecutor to two experts and the investigating officer. We discern no error.

a. *The prosecutor's hypothetical questions to Dr. Levicky were not improper.*

As noted *ante,* during direct examination of Dr. Levicky, the prosecutor asked whether someone who had suffered a bullet wound similar to Rafael's would "be able to maintain consciousness and walk or run about 75, 100, 125 feet?" Dr. Levicky answered affirmatively. The prosecutor also posed a hypothetical question as to whether a person who had suffered a gunshot wound like Rafael's would be "able to walk or run approximately 100 feet, make two or three phone calls, and speak words to the effect of what happened to him during that [ordeal] in the course of at least 10 to 15 minutes." Defense counsel objected that the latter question was speculative and lacked foundation. Counsel's objection was overruled, and Dr. Levicky answered: "Yes, it is possible." During redirect examination, the prosecutor asked Dr. Levicky another hypothetical question including the following: "[I]f this person was wearing clothing or layers of clothing, is it your experience that clothing would absorb any of the initial blood that was exuded from those entry and exit wounds?" Defense counsel objected that the question

26

called for speculation and was an improper hypothetical because there was no evidence Rafael had been wearing layers of clothing. The court overruled the objection, and Dr. Levicky answered: "Yes, it is possible." Chico argues these questions were improper hypotheticals, not rooted in the facts of the case, because (1) the distance between the pool hall and Baskin Robbins was "185 feet," not 125 feet, and (2) there was no evidence Rafael was wearing layers of clothing.

An expert may render opinion testimony on the basis of facts given in a hypothetical question that asks the expert to assume their truth. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618.) Such hypothetical questions " 'must be rooted in facts shown by the evidence.' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1045; *People v. Moore* (2011) 51 Cal.4th 386, 405.) An expert's opinion may not be based on assumptions of fact without evidentiary support, or on speculation or conjecture. (*Vang*, at p. 1046; *People v. Richardson* (2008) 43 Cal.4th 959, 1008.) However, a hypothetical question need not encompass all of the evidence, and may assume facts within the limits of the evidence. (*Vang*, at p. 1046.)

The prosecutor's questions regarding the victim's clothing did not run afoul of these principles. The evidence showed Rafael's bloody clothing was cut off by paramedics and found in front of the Baskin Robbins, and the jury was shown crime scene photographs depicting the clothing. Hernandez identified photographs of several items of clothing as those worn by Rafael the night of the shooting. The prosecutor's question was whether a victim's "*clothing or* layers of clothing" could absorb blood from a wound. (Italics added.) The evidence obviously showed Rafael was wearing clothing. The hypothetical was not improper.

As to Chico's other contention, evidence at trial showed Rafael was found approximately 125 feet from the area inside the pool hall where the shooting occurred. Detective Barba measured the distance between the pool hall exit and the spot where Rafael was found in front of the Baskin Robbins, and determined it was 75 feet. He estimated the distance between the spot from which Chico fired to the pool hall exit as "[m]aybe 50 feet." Officers also found drops of blood east of the location where Rafael

27

collapsed, and at trial defense counsel argued this added an additional 60 feet to the distance estimate. But even assuming the prosecutor's hypothetical underestimated the relevant distance, no prejudicial error is apparent. During closing argument, defense counsel pointedly attacked the evidence on this very point, arguing that Rafael had to have walked a greater distance, given that the blood trail extended 60 feet past where his body was found. There is no likelihood the jury would have come to a different conclusion absent the hypothetical.[7]

        b. *The criminalist's testimony regarding DNA transfer was proper.*

Criminalist Meiling Cabral testified for the prosecution regarding testing of item 18 for DNA evidence. During direct examination, the prosecutor posed the following hypothetical question: "[L]et's say . . . item number 18 was actually recovered by a layperson not a scientist and recovered using some sort of paper napkin, would that contribute also to possible loss of D.N.A. through transfer?" Cabral answered: "Criminalist[s] are trained to collect evidence in a way to best preserve it. When you say a layperson, they're not trained to collect evidence in a proper manner necessarily that would preserve evidence, and if collected in that manner, in my opinion, I don't think that —it's not hard to imagine that there was loss of evidence." Defense counsel objected, "calls for speculation, motion to strike." The trial court overruled the objection.

Chico complains that Cabral's answer should have been stricken because the wording of Cabral's response, " 'it's not hard to imagine,' " demonstrated the speculative nature of the testimony.[8] He is incorrect. Cabral testified as an expert on DNA testing, and described her training and experience. It was within the realm of her

---

[7]     We also note that, in his declaration in support of Chico's habeas petition, Dr. Levicky states that "Mr. Marcos may have been able to walk in some fashion for 185 feet . . . ."

[8]     Chico also contends the evidence was improper because the chain of custody was flawed. We address this question *post.*

expertise to opine on whether DNA might be lost if evidence was picked up with a paper towel by a layperson.  Her use of the words " 'it's not hard to imagine,' " in context, did not indicate speculation, but instead indicated her opinion that the DNA loss was a possibility.  The objection was properly overruled.

        c. *Detective Barba's testimony about blood trail evidence.*

        On direct examination, the prosecutor asked Detective Barba whether it was "uncommon to go to a crime scene where somebody has been shot and find the victim not necessarily at the scene where he's been shot without a blood trail?"  Defense counsel's relevance objection was overruled.  Barba then testified:  "Yes . . . when someone gets shot, it's not like the movies where you get shot, blood falls out.  It's very common for someone to be shot and then the blood to be soaking in their clothing and the blood actually to fall on the ground hundreds of feet away from the actual shooting location."

        In a cursory argument raised for the first time in his reply brief, Chico avers that Detective Barba's testimony should have been stricken because no foundation was established for his expert testimony and "there was no relevance established that would link the condition of the past shooting victims viewed by . . . Barba with that of Rafael."

        Defense counsel did not object on the grounds now advanced, and therefore this contention has been forfeited.  (Evid. Code, § 353, subd. (a); *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 81-82; *People v. Williams* (2008) 43 Cal.4th 584, 626.)  The contention has also been forfeited because Chico failed to raise it in his opening brief.  " 'Withholding a point until the reply brief deprives the respondent of an opportunity to answer it . . . .  Hence, a point raised for the first time therein is deemed waived and will not be considered, unless good reason is shown for failure to present it before.  [Citations.]  No good cause is shown here.' [Citation.]" (*People v. Clayburg* (2012) 211 Cal.App.4th 86, 93; *People v. Baniqued* (2000) 85 Cal.App.4th 13, 29.)

        Apart from the question of forfeiture, the contention lacks merit.  Detective Barba was a homicide detective with 15 years of experience as a police officer and three to four years as a homicide detective.  He testified that his opinion was based on his "own investigations."  This provided sufficient, although not extensive, foundation for his

29

opinion.  It is a reasonable inference that as a homicide detective and as a police officer, Barba would have experience and knowledge of the topic.  Given that the defense did not object on foundational grounds, it is not surprising that Barba's expertise in this area was not further developed.  There was no error in admitting the challenged testimony.

        8. *Defense closing argument.*

        The prosecutor's objections to three portions of defense counsel's closing argument were sustained.  Chico contends the court's rulings were prejudicial error.

        a. *Argument regarding the effect of provocation.*

        During argument, defense counsel stated:  "[T]he law says there is [*sic*] different levels of culpability.  If the killing results in quarrel, heat of passion, that person is not culpable of first degree murder, not even second degree murder.  [¶]  In second degree murder, the prosecutor comes up and tells you well, hey, provocation, just on the face of it.  You're going to get an instruction, provocation can reduce a first degree murder to second degree murder but can also reduce a first degree or second degree murder to voluntary manslaughter.  So—"  The prosecutor objected that the argument misstated the law.  After the court sustained the objection, defense counsel continued:  "Okay.  I'm sorry.  It can reduce a second degree murder to voluntary manslaughter, provocation.  So you're going to have to decide, well, is the provocation sufficient to reduce an intentional unlawful killing from second degree to voluntary manslaughter?"

        Chico contends the objection should have been overruled because his argument was a correct statement of law.  The People counter that the argument improperly conflated the provocation that can reduce murder to manslaughter with that which can reduce first degree murder to second degree murder.  "[A] subjective test applies to provocation as a basis to reduce malice murder from the first to the second degree:  it inquires whether the defendant in fact committed the act because he was provoked. . . .  But more is required to reduce malice murder to voluntary manslaughter.  For that, an objective test also applies:  the provocation must be so great that . . . it 'would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.' "  (*People v. Jones* (2014) 223 Cal.App.4th

30

995, 1000-1001; *People v. Padilla* (2002) 103 Cal.App.4th 675, 678.)

Defense counsel misspoke when he stated that "If the killing *results in* quarrel, heat of passion, that person is not culpable . . . ." (Italics added.) However, it appears this was not the portion of the argument the court found objectionable. Counsel's further argument that provocation can reduce a first degree murder to second degree murder, and a murder to voluntary manslaughter, was a correct statement of law and tracked the language of the applicable jury instruction. (See generally *People v. Trinh* (2014) 59 Cal.4th 216, 231; *People v. Carasi, supra*, 44 Cal.4th at p. 1306.) Contrary to the People's contention, counsel's statements did not improperly conflate the objective and subjective standards; the defense argument was not addressing this point.

However, any error was harmless under any standard. The jury was instructed with CALCRIM No. 522 that "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]." The instruction clarified and reiterated the point defense counsel was trying to make. The objection impacted a very brief part of the argument, and did not, as Chico suggests, discourage the jury from finding provocation. Given that the jury was correctly instructed and defense counsel's argument was not significantly curtailed, we discern no prejudicial error.

b. *Argument regarding standard of proof.*

Defense counsel made the following argument regarding the standard of proof: "I want to talk about the different standards of proof because in our system of justice, there are many standards of proof, and I want to emphasize that the standards of proof beyond a reasonable doubt is the highest standard there is in our legal system. [¶] These are some common standards, and they're here for you so you can get an idea of proof beyond a reasonable doubt, and I'm not sure that you can see it, so I'll read it. At the bottom there, it says, 'possible'; maybe your guess is as good as mine. Well, in our legal system, that's not even a standard. [¶] So when Dr. Levicky goes on the stand and after this inaccurate hypothetical is given by the prosecutor, and at the end Dr. Levicky goes 'It's possible,' that's the level of proof you got, possibility; that's not a standard." The prosecutor objected, "misstates the law as it applies to the evidence." The trial court

31

responded: "I'm going to sustain it. The burden of proof is reasonable doubt. Let's stick with the burden as in this case, [defense counsel]."

It appears that defense counsel was trying to make the point that testimony something was merely "possible" did not suffice to establish proof beyond a reasonable doubt. This was not objectionable. However, any error was harmless under any standard. The court reiterated the reasonable doubt standard, which could not have prejudiced the defense. Defense counsel later made the argument that was cut short by the objection, arguing that Dr. Levicky's testimony that it was "possible" Rafael could have walked to the Baskin Robbins was meaningless.[9]

c. *Argument regarding self-defense.*

Finally, the following transpired during defense counsel's closing argument:

"[Defense counsel]: "So what I'm . . . telling you, is that if there is some of you at the end who think despite . . . all the lack of evidence whether the two shots actually connected with anybody in the pool hall still and if you still think at the end that Mr. Chico shot the fatal shot, committed the act, at worst, this case is voluntary manslaughter not murder. You're not getting an instruction on self-defense, but you know what the facts [are]."

"[The prosecutor]: Objection, Your Honor.

"The Court: Sustained.

"[Prosecutor]: It's . . . improper."

"The Court: Sustained. Self-defense is not an issue.

"[Defense counsel]: "I'm not going to be able to argue it, Your Honor?"

Defense counsel then continued on, omitting further mention of self-defense.

Defense counsel's statement signaled to the court that counsel intended to argue a self-defense theory, which the court had already concluded was not supported by

---

[9]     Counsel argued: "Dr. L[e]vicky—I like him; he's a nice man, but when he tells you it's possible, that doesn't mean anything. What it means your guess is as good as mine."

32

substantial evidence. As we have explained, neither perfect nor imperfect self-defense was applicable here because Chico's use of a gun amounted to more than necessary force. Accordingly, the court's ruling was not error.

9. *Ineffective assistance of counsel.*

Chico contends, in his direct appeal and in his petition for a writ of habeas corpus, that his counsel was ineffective in a plethora of ways. Chico raised the majority of these claims in his motion for a new trial, which was denied. In support of the new trial motion and the habeas petition, Chico has provided additional declarations and documentary evidence. The issues raised by Chico's habeas petition, new trial motion, and direct appeal overlap, making it impractical to address each separately. Instead, as to the contentions not already considered *ante,* we address each claim of ineffective assistance seriatim, considering the materials and arguments raised in the petition, appeal, and motion together.

a. *Applicable law*.

"To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Scott* (1997) 15 Cal.4th 1188, 1211-1212; *Strickland v. Washington, supra,* 466 U.S. at p. 694; *People v. Homick, supra,* 55 Cal.4th at p. 893, fn. 44.) If the defendant makes an insufficient showing on either component, the claim fails. (*People v. Homick, supra,* at p. 893, fn. 44.) If the record sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.) We presume counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial

33

strategy. (*Carter*, at p. 1211; *People v. Jones* (2003) 29 Cal.4th 1229, 1254.) However, deference is " ' "not abdication" [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny . . . .' " (*People v. Jones* (2010) 186 Cal.App.4th 216, 236.)

Attached to Chico's habeas petition is an unsigned, "proposed" declaration of trial counsel. Appellate counsel explains that her "office has corresponded" with trial counsel; has "received responses to [their] inquiries;" and has prepared the proposed declaration purportedly based on these responses. However, trial counsel has not signed the declaration and, according to appellate counsel, "has chosen not to be entirely cooperative." Because trial counsel has not indicated agreement with the statements made in the proposed declaration, we do not consider it.

b. *Advice not to testify at trial.*

Chico did not testify at trial. He now argues that counsel's advice that he not testify was unreasonable, and his on-the-record waiver of that right was coerced. Neither of these claims have merit.

The decision to have the defendant testify is ordinarily within the competence and purview of trial counsel. (*People v. Hayes* (1991) 229 Cal.App.3d 1226, 1231.) However, " 'the right to testify in one's own behalf is of such fundamental importance that a defendant who timely demands to take the stand contrary to the advice given by his counsel has the right to give an exposition of his defense before a jury.' " (*People v. Allen* (2008) 44 Cal.4th 843, 860; *People v. Nakahara* (2003) 30 Cal.4th 705, 717.)

At the close of the defense case, counsel stated the following on the record: "During the preparation and the pendency of this case, I advised my client of all of his rights, the rights he has, one of which was to testify. I even advised him that I could not make that decision; that even—no matter what I thought, that it was his decision and he understood that; that he had a right to testify, and we've discussed the case, and my client came to a decision—conclusion, that he did not want to testify in this case; that he wanted to stand on the evidence that was submitted, and, therefore, not to testify." The

trial court asked Chico whether counsel's statements were correct, and Chico replied affirmatively.

In his declaration filed in support of his habeas petition, Chico states the following. During the year preceding trial he told defense counsel he wished to testify, and counsel agreed. Just before trial, defense counsel expressed doubts about having him testify. Counsel told Chico that if he testified he would be convicted, but if the defense simply relied on the state of the evidence, there was a chance of success. Chico "did not dare disobey." Counsel purportedly instructed Chico as to how to respond to the court when the waiver was taken. Chico was "too intimidated, frightened and overwhelmed" to disagree and did not realize he could "act in contravention to [his] attorney's desires" if he wanted to avoid conviction. Counsel never told him it was his constitutional right to testify regardless of counsel's evaluation.

Chico's statements are belied by the on-the-record exchange in which he acknowledged being told he had the right to testify regardless of his attorney's opinion, and expressly waived that right. The remainder of his statements demonstrate only that he found it prudent to follow his counsel's judgment. A defendant who wishes to testify against his attorney's advice "must timely and adequately assert his right to testify. . . . When the record fails to show such a demand, a defendant may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to his counsel his desire to testify, he was deprived of that opportunity." (*People v. Hayes, supra,* 229 Cal.App.3d at pp. 1231-1232; *People v. Enraca* (2012) 53 Cal.4th 735, 762-763.) Unless the defendant has made a timely demand, the decision whether to permit the defendant to testify "goes to the heart of trial tactics" and therefore "rarely would support a claim of ineffective assistance of counsel." (*People v. Lucas* (1995) 12 Cal.4th 415, 444.) Chico did not timely assert his right to testify, and cannot now complain that he was coerced. (*Enraca*, at pp. 762-763; *Hayes*, at pp. 1231-1232; *People v. Guillen* (1974) 37 Cal.App.3d 976, 984-985.)

Chico's argument that his attorney's advice was unreasonable fares no better. In a declaration in support of Chico's new trial motion, appellate counsel stated that she had

reviewed a November 22, 2011 entry in trial counsel's "case notes chronology" explaining his rationale for not having Chico testify. According to appellate counsel, that entry stated trial counsel had advised Chico not to testify because (1) his testimony could potentially be impeached by his recorded police interview; (2) the People would likely introduce the police interview, making it unnecessary for Chico to testify to any statements contained therein; and (3) by testifying, Chico would inadvertently shift the burden of proof because the outcome would hinge on whether the jury believed him. According to trial counsel's notes, Chico agreed with this assessment.

Chico argues that his testimony was crucial to demonstrate he lacked the requisite mens rea and to establish a third party culpability defense (discussed *post*). He points out that he has no prior criminal record. Any potential conflicts in his police interview could have been explained away, he argues, because he would have testified that at the time of the interview he was sleep deprived after a lengthy plane flight; was hungry and in pain from being handcuffed; and was tricked by "devious" detectives who falsely told him they had a videotape of the shooting and put words in his mouth.

Based on the record before us, it was a reasonable tactical decision for counsel to conclude the police interview might impeach Chico, and that Chico's explanations would fail to convince the jury. Appellate counsel has opted to include in support of the habeas petition only selected portions of the transcript of Chico's police interview. Especially where we are unable to review the entire transcript, we will not second guess counsel's conclusion that Chico could have been impeached, or his story undercut, by the police interview. The fact the police interview was ultimately not introduced into evidence by the prosecutor is not significant; there was always the danger that, had Chico testified, the prosecutor would offer it in rebuttal. Counsel could reasonably have concluded that jurors would view with skepticism Chico's excuses for any contradictory or inculpatory statements during the interview. Counsel presented a robust argument, focusing on the weaknesses in the People's case, including, among other things, the facts that no one in the crowded bar saw Rafael actually hit by the gunshot; no one saw him react, scream, or stumble about; although the medical examiner testified the gunshot was a contact wound,

36

no one saw Rafael in close proximity to Chico when the shots were heard; no DNA was found on the bullet, and the blood evidence was inconclusive; and Rafael's ability to walk and make telephone calls for possibly 12 minutes after the gunshots was inconsistent with the severity of his wounds. By highlighting these facts, counsel focused the jury on the People's burden to prove their case, rather than on Chico's credibility. Chico's account of events was problematic in a variety of respects, as we discuss *post.* Unlike in *People v. Callahan* (2004) 124 Cal.App.4th 198, 215, here counsel's advice did not leave Chico without a defense. Instead, counsel made a reasonable tactical choice to attack the People's case and show they had not met the burden of proof.

      c. *Failure to present a third party culpability defense.*

      Chico theorizes that another man, Donald Giron, must have been responsible for the for the murder. Chico's declaration in support of his new trial motion stated the following. Chico was a truck driver, and lived with his family in North Carolina. When in California, he often stayed with Jesus Elvir, his wife Martha Martinez Vegas, and their daughter Claudia Briceno. Giron, a "dark-skinned Honduran man," was Chico's trucking partner, and the two were "close." On the night of the shooting Chico went to the pool hall at 11:00 p.m. with Elvir, Martinez Vegas, Briceno, and another friend, Dora Orellana. Chico had been ill all evening and did not consume any alcohol. Giron was at the pool hall and Chico noticed that he and "three Mexican gentlemen" at the next table appeared to be involved in a heated discussion. Chico told Alvarez and requested that she ask the Mexican men to leave. Alvarez did not immediately do so. One of the Mexican men left the pool hall and "returned with what [Chico] perceived to be an air of confidence, as though he now had a weapon and wished to be more confrontational." Chico asked Alvarez again to remove the men. One of the three men then hit Chico in the face, and another hit him in the back. He saw one of the men had a knife. However, Chico still hoped to "keep the peace." Giron pulled out a gun "as if to use it." In an effort to keep the peace, Chico took the gun from Giron. Alvarez pushed Chico's hand, causing the gun to accidentally discharge into the ceiling. Chico "[i]mmediately" gave the gun back to Giron. Giron then left the pool hall, and Alvarez ordered everyone to

37

leave. Chico waited near the front door with Elvir for the women. The group left for their home immediately thereafter. Chico did not shoot anyone, did not tell Alvarez he would shoot the men, did not see anyone who appeared to have been shot, and did not learn anyone had been shot until later.

In his declaration in support of his habeas petition, Chico gives essentially the same account, with a few additions and changes. He adds that Giron made a comment to the Mexican men "about 'taking it outside,' " and he observed all three Mexican men walk out of the pool hall in a "normal manner, not as though anyone had been shot." Chico hypothesizes that "the likelihood was that [Giron] shot Rafael outside the club." Chico omits any suggestion that the Mexican men had a weapon.

Chico argues that trial counsel performed ineffectively by omitting the "central theory" that Giron shot Rafael outside the pool hall. He contends counsel's efforts to locate Giron and investigate the defense were inadequate; counsel's decision to forego the defense was unreasonable; and he should have testified in his own defense to establish the third party culpability theory. Additionally, trial counsel should have presented the following evidence. (1) Elvir, Martinez Vegas, Orellana, and Briceno should have testified that: Giron was in the pool hall that night; Chico left with Elvir's group shortly after the accidental shot into the ceiling, and would not have had time to shoot the victim in the parking lot; Chico's demeanor after the crime was calm and inconsistent with a killer's; and Chico stayed at Elvir's house for several days before starting a trucking run to North Carolina. (2) A Los Angeles Police Department "Chronological Record" showed that Detective Barba spoke to Giron by telephone in December 2010, and Giron admitted being at the pool hall on the night of the shooting. This information should have been elicited from Detective Barba at trial. (3) Raul should have been cross-examined more thoroughly regarding the unidentified man who initially challenged him to fight. (4) Counsel should have discovered and presented Giron's criminal and gun ownership records.

Chico has failed to establish ineffective assistance. First, the record does not demonstrate counsel performed an inadequate investigation. (See *People v. Jones, supra,*

38

186 Cal.App.4th at pp. 238-239 [competent counsel must carefully investigate the factual bases for defenses, diligently pursue leads indicating the existence of favorable evidence, and make rational and informed decisions on strategy and tactics founded on adequate investigation and preparation].)  Declarations from Elvir, Martinez Vegas, Briceno, and Orellana demonstrate that counsel or a defense investigator interviewed them.[10]  Other documents in the record indicate trial counsel did make significant attempts to locate Giron.[11]  Moreover, trial counsel had an excellent reason for failing to present Giron as a witness, even if he had been located.  According to Detective Barba's notes, Giron admitted being at the pool hall and singing karaoke, but denied any responsibility for the murder.  Presenting this testimony at trial would hardly have helped the defense case.  Given that Giron could not be located and would not have helped the defense case, counsel had no reason to explore his criminal or gun ownership records.  Moreover Giron's statements to Barba admitting that he was at the pool hall were hearsay, and it is unclear at best that they would have been admissible, as they likely comprised testimonial hearsay.  (See *Crawford v. Washington* (2004) 541 U.S. 36; *Davis v. Washington* (2006) 547 U.S. 813; *People v. Cage* (2007) 40 Cal.4th 965.)  Chico has also failed to offer anything other than speculation to show that further cross examination of Raul would have proved fruitful.

---

**10**     Although Martinez Vegas stated in her declaration in support of the new trial motion that counsel did not contact her, in her second declaration in support of the habeas petition she acknowledges that counsel spoke to her at the courthouse and she "may have been" contacted by one of his investigators.

**11**     These materials include a letter from the public defender's office to the Georgia Department of Driver Services, a subpoena duces tecum to the same department, and a Public Defender Investigation Report indicating that in October 2011 a defense investigator went to Giron's last known address in Georgia, spoke to the residents and neighbors, and determined that Giron had moved from the house six months previously and had not been seen since.  The investigator canvassed the area and left his business card on doors, but uncovered no leads.

Further, trial counsel's tactical choice to eschew a third party liability defense was not unreasonable.  Contrary to Chico's contention, there was not "[a]mple evidence" of Giron's guilt.  To accept that Giron was the murderer, the jury had to believe either that (1) Giron fired the second shot in the pool hall, or that (2) Giron shot the victim outside the pool hall.  Neither theory was promising for the defense.  Theory (1) depended on the jury finding that "[Giron], not Chico[,] had possession of the gun at all times, save the moment when Chico accidentally shot into the ceiling . . . ."  But Nolasco, Martinez, and Raul saw Chico holding the gun when or after the *second* shot was fired.  As the witnesses were focused on Chico, they would surely have seen the gun pass between Chico and Giron.  No one, however, claimed to have seen Chico hand the gun off to a second person in the two to six seconds between the shots.

No one, however, claimed to have seen Chico hand the gun off to a second person in the two to six seconds between the shots.

As for theory (2), no witness heard shots or saw anyone shooting outside the building as they departed.  No bullet casings or projectiles were found outside the pool hall.  Given the timing of Rafael's telephone calls, the shooting had to occur, if not in the pool hall, very shortly after the patrons exited.  Contrary to Chico's contentions, trial counsel *did* argue that the victim must have been shot outside the pool hall, based on the timing of the phone calls, the blood evidence, and the medical examiner's testimony the shot inflicted a contact wound.  Given the weaknesses in the third party culpability theory, counsel's tactical choice was far from unreasonable.  We do not " ' "second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." ' "  (*People v. Loza* (2012) 207 Cal.App.4th 332, 351.)  As the United States Supreme Court explained three decades ago:  "Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence . . . .  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way."  (*Strickland v. Washington, supra,* 466 U.S. at p. 689.)

40

*Thomas v. Chappell* (9th Cir. 2012) 678 F.3d 1086, cited by Chico, is distinguishable. In that case, the evidence implicating a third party, and not presented by defense counsel, was far more extensive and exculpatory than the speculative and weak evidence of third party guilt here.

    d. *Failure to call Elvir, Martinez Vegas, Orellana, and Briceno.*

Chico avers that, apart from their relevance in proving a third party culpability defense, witnesses Elvir, Martinez Vegas, Orellana, and Briceno should have been called to establish his non-violent character. Whether to call particular witnesses is a matter of trial tactics unless the decision results from an unreasonable failure to investigate. (*People v. Bolin, supra,* 18 Cal.4th at p. 334; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059.) According to appellate counsel's declaration, trial counsel's notes dated November 22, 2011, state that he decided not to have these witnesses testify because, inter alia, none of them saw the shooting; the women were in the restroom and Elvir stated he was in the pool hall but lacked knowledge of the shooting. Counsel's notes stated he might call two of the women as character witnesses.

Counsel's notes reveal he made a considered, tactical choice not to have these witnesses testify. As we have discussed, trial counsel did not fail to investigate; he or his investigator spoke with all four witnesses. Moreover, the record suggests a compelling tactical reason for counsel's decision by the time of trial. At an Evidence Code section 402 hearing prior to trial, defense counsel sought to exclude evidence of a July 2007 incident in which Chico allegedly argued with the owner of a trucking business, attacked him with a wrench, was subdued by other employees, threatened to kill the victim, obtained a tire iron, and broke a truck's windows. Moreover, the victim told police Chico always carried a gun. The prosecutor represented that he did not intend to use the evidence in his case-in-chief, but might use it as character evidence in rebuttal. The trial court indicated it would consider admitting the evidence as "rebuttal character evidence" if the defense presented character evidence. Evidence of the prior incident could have been highly damaging to the defense case. Trial counsel could reasonably have

concluded that the value of the testimony of Elvir, Martinez Vegas, and Briceno would be far outweighed by the evidence of the 2007 incident.

e. *Failure to introduce evidence of Chico's loan to Alvarez.*

Chico's declarations stated that prior to the shooting he loaned Alvarez $9,000. She failed to repay the loan, however, and on the night of the shooting they argued about it. Chico threatened to tell Alvarez's husband that Alvarez was having an affair if she did not pay him back. Chico contends these facts gave Alvarez a motive to testify falsely, and trial counsel should have cross-examined her about them.

The record reflects that defense counsel subpoenaed Alvarez's bank records and sought an in-camera hearing to establish their relevance. Appellate counsel avers she has examined trial counsel's notes. According to appellate counsel, an entry dated October 31, 2011 states that trial counsel determined there was an out-of-state deposit of $3,500 cash to Alvarez's account; trial counsel made a handwritten copy of the records; and the trial court found, in the in-camera hearing, that the records were relevant. Chico contends trial counsel's failure to examine Alvarez regarding the loan was "unthinkable."

Trial counsel clearly performed significant investigation into the purported loans. The record gives no indication of the reason for counsel's decision not to use the evidence to impeach Alvarez. The fact counsel pursued the lead and declined to question Alvarez on the subject suggests he had a tactical reason for his actions. As noted, where the record sheds no light on the reasons for counsel's actions, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Gamache* (2010) 48 Cal.4th 347, 391.) There could be a variety of satisfactory explanations here: counsel might have determined the deposit did not actually represent a loan, or the loan might have been repaid after all. It does not appear that trial counsel has refused to provide an explanation; instead, the record suggests counsel has declined to adopt the particular declaration appellate counsel has chosen to draft. Under these circumstances we cannot conclude trial counsel performed below an objective standard.

42

Nor is prejudice apparent. Even if Alvarez failed to repay a loan, it is a leap to conclude she would have falsely implicated Chico. Her testimony was corroborated by other witnesses. Moreover, had she actually intended to commit perjury to get Chico convicted, she could doubtless have done a better job by testifying that, for example, she saw the shot hit Rafael. Instead she testified that she only heard the shots and did not see the victim hit.

f. *Failure to object to admission of the bullet fragment.*

Chico argues trial counsel performed ineffectively by failing to move to exclude evidence of the bullet fragment denominated item 18 on the grounds it was irrelevant and the chain of custody was flawed. He is incorrect. "The decision whether to object to evidence at trial is a matter of tactics and, because of the deference accorded such decisions on appeal, will seldom establish that counsel was incompetent." (*People v. Lucas, supra,* 12 Cal.4th at p. 444.) Any motion to exclude the evidence due to a purportedly flawed chain of custody was unlikely to succeed in the instant case, because the chain of custody was adequately established. "The rules for establishing chain of custody are as follows: ' "The burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight." ' [Citations.]" (*Ibid*.; *People v. Richardson, supra,* 43 Cal.4th at p. 1003.)

Alvarez testified she locked the pool hall up after the shooting, returned the next day, found the bullet fragments on the floor, picked them up with a paper towel, put them in a Gatorade bottle, put the bottle in a box which she hid outside her home by the "boiler," and, when she was interviewed by the detective, her daughter retrieved the

fragments from their hiding place and turned them over to him. The vital links in the chain were accounted for, and there was no evidence of tampering. (See *People v. Lucas, supra,* 12 Cal.4th at p. 444 [chain of custody adequately established despite fact the identity of the deputy who seized evidence from defendant's home was somewhat uncertain]; *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 311, fn. 1 [" 'gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility' "]; *People v. Catlin* (2001) 26 Cal.4th 81, 134.) " 'While a perfect chain of custody is desirable, gaps will not result in the exclusion of the evidence, so long as the links offered connect the evidence with the case and raise no serious questions of tampering.' " (*Catlin*, at p. 134.) To the extent that Alvarez's handling of the evidence might have eliminated inculpatory evidence, this inured to Chico's benefit. Counsel might reasonably have concluded an objection on chain of custody grounds would be "less productive for defendant than a decision to permit the prosecutor to establish a shoddy chain of custody that can be pointed out to the jury in the hope of giving rise to a reasonable doubt." (*Lucas*, at p. 446.) Here, counsel effectively attacked the chain of custody in closing argument.

Nor would an Evidence Code section 352 challenge have been sustained. It is obvious that the bullet fragments had a tendency in reason to prove material issues in the case (Evid. Code, § 210), and were not unduly prejudicial. (*People v. Scott* (2011) 52 Cal.4th 452, 491 [evidence is prejudicial under section 352 if it uniquely tends to evoke an emotional bias against the defendant and has little effect on the issues].) The fact the blood test was not conclusive did not render the evidence inadmissible, but went to its weight. Defense counsel is "not required to make futile motions or to indulge in idle acts to appear competent." (*People v. Torrez* (1995) 31 Cal.App.4th 1084, 1091.)

g. *Failure to more thoroughly cross-examine Bello.*

Chico next argues that trial counsel should have more thoroughly examined Bello regarding Rafael's ability to speak and what he said during the post-shooting phone call. However, the prosecutor asked Bello how Rafael's voice sounded, whether he was able to speak clearly, whether she understood him, whether he could still speak, and how he sounded, during the second call. She testified he sounded agitated, spoke clearly, and she understood him. These answers were favorable from the defense point of view. As the prosecutor elicited positive information by asking these questions, trial counsel cannot have performed ineffectively by failing to ask additional questions.

Chico also avers Bello should have been more closely questioned regarding the demeanor of Raul and Raymundo, who were with Rafael at the pool hall, after the shooting. In her pretrial interview with Detective Barba, Bello stated that Raul and Raymundo had not explained to her what happened at the pool hall and avoided looking at her, and she felt the shooting was their fault. " 'As to whether certain witnesses should have been more rigorously cross-examined, such matters are normally left to counsel's discretion and rarely implicate inadequacy of representation. [Citations.]" (*People v. Bolin, supra,* 18 Cal.4th at p. 334.) The evidence showed Chico was embroiled in a dispute with three men at the pool hall, inferentially the Marcos cousins, and that one of them punched him. Thus the evidence already suggested the cousins precipitated or exacerbated the situation, and counsel could have made a reasonable tactical decision that no further evidence would be helpful.

h. *Dr. Levicky's testimony.*

In support of his habeas petition, Chico attaches the declaration of Dr. Vladimir Levicky, the deputy medical examiner who testified for the People at trial. In it, Dr. Levicky opines that when hit by the gunshot Rafael: (1) would have "moved in the manner of a boxer who had just received a blow," and his body would have appeared to shake; (2) would have been "stumbling and disoriented" within one to two minutes; (3) likely would have lost consciousness and gone into hemorrhagic shock within three to four minutes; (4) would have been unable to breathe properly within two to three

minutes; and (5) would have suffered irreparable brain injury within 10 minutes. Dr. Levicky also opined: "While Mr. Marcos may have been able to walk in some fashion for 185 feet, and while external bleeding may have been delayed for a certain amount of time, had he walked said distance, the likelihood is that he would have at least begun to exhibit the above-mentioned symptoms within 1 to 2 minutes." Emergency medical services records indicated that Rafael had no pulse at 12:18 a.m. In Levicky's opinion, for Rafael "to have been able to talk to his wife in a somewhat clear and normal manner," it is likely the telephone call occurred "within 1 to 2 minutes of the shooting" and "it is unrealistic to conclude [Rafael] could have made that telephone call 12 minutes after he was shot." Moreover, it was highly unlikely Rafael hid for 10 to 12 minutes after being shot.

Chico avers that trial counsel failed to fully investigate and elicit the exculpatory information now contained in Dr. Levicky's declaration prior to trial. Not so. Dr. Levicky's declaration also states that trial counsel did interview him, but he does not recall whether counsel asked about these issues. Moreover, at trial Dr. Levicky testified that the victim of a gunshot wound like Rafael's could possibly be "able to walk or run approximately 100 feet, make two or three phone calls, and speak words to the effect of what happened to him during that [ordeal] in the course of at least 10 to 15 minutes." Counsel cannot be faulted for failing to obtain information from the witness when the record suggests the doctor's opinion may have changed since trial. On this record we cannot conclude trial counsel failed to sufficiently investigate Dr. Levicky's testimony.

Nor is there any showing of prejudice. Trial counsel made a robust argument based on precisely the issues suggested in the habeas petition, including that it was unreasonable to believe Rafael was shot at 11:50, but displayed no indication of being shot. The force of this argument was not dependent upon expert testimony: as a matter of common sense, jurors were likely to question why no one saw Rafael react as if he had been hit in the pool hall, or fail to call for help immediately. Counsel elicited from the prosecution witnesses that they had not seen anyone behaving as if shot in the pool hall. Counsel also elicited from bartender Martinez that he and Alvarez left seven minutes

46

after hearing the shots, bolstering the defense theory that someone shot Rafael outside of the pool hall. The prosecutor did not contend Rafael could have survived longer than 12 minutes after the shot. Moreover, the defense argument depended on the premise that the shot occurred at 11:50, just before Alvarez ushered everyone out of the pool hall. But Alvarez was the only witness who testified at trial that she closed up shop at "[a]round 11:50."[12] As we have explained *ante,* Raul's testimony suggested a shorter period between the shooting and Rafael's calls. Dr. Levicky did not opine that it was impossible for Rafael to have walked 185 feet after being shot. Thus, Chico has established neither prong of his ineffective assistance claim in regard to trial counsel's investigation of Dr. Levicky's testimony.

i. *Other purported failures.*

Chico cursorily argues that trial counsel should have more thoroughly cross-examined witnesses, and/or hired experts to evaluate: the timing of Rafael's death; the distance and direction of the blood drops or trail; the trajectory of the bullets; the blood and DNA evidence; wound analysis; and the ability of a shooter to accurately aim a shot after accidentally firing a gun. He also urges that counsel should have challenged "any conclusions improperly drawn by the prosecution's experts regarding ballistics, blood and DNA (or lack thereof)." These allegations are too vague and conclusory to demonstrate any lack of competence on counsel's part. In regard to these conclusory allegations, " '[d]efendant identifies no exculpatory or impeachment evidence that counsel could have revealed by further questioning of prosecution witnesses [or examination of defense experts] and that would have produced a more favorable result at trial. . . . Such claims must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood for exonerating the accused. [Citations.] We cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation.' [Citations.]" (*People*

---

**12**      Indeed, at the preliminary hearing Alvarez testified that she left the pool hall "maybe three or four minutes before 12:00 midnight."

47

*v. Bolin, supra,* 18 Cal.4th at p. 334.) The record before us does not establish defense experts or other witnesses would have provided exculpatory evidence if called, nor does Chico demonstrate how unspecified challenges to the People's experts could have benefitted the defense. We decline to speculate on these matters. (*Ibid.*) Chico's assertion that trial counsel should have done more to develop the timing issue through further examination of Bello and Hernandez is also unavailing. Chico fails to demonstrate that the suggested lines of inquiry were not adequately pursued, or that further examination would have materially assisted the defense case.

10. *Cumulative error.*

Chico contends that the cumulative effect of the purported errors demonstrates prejudice. As we have " 'either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial,' " we reach the same conclusion with respect to the cumulative effect of any purported errors. (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236; *People v. Butler* (2009) 46 Cal.4th 847, 885.)

11. *New trial motion.*

Finally, Chico urges that the trial court erred by denying his motion for a new trial. (§ 1181; *People v. Ault* (2004) 33 Cal.4th 1250, 1260; *People v. Masotti* (2008) 163 Cal.App.4th 504, 507.) A trial court has broad discretion in ruling on a new trial motion, and its decision will be disturbed only for clear abuse of that discretion. (*Ault*, at p. 1260.) Such an abuse of discretion arises if the court's decision is based on an incorrect legal standard. (*People v. Knoller, supra,* 41 Cal.4th at p. 156.) Chico's new trial motion was based on the same grounds that we have considered and rejected here. As we have determined none of his claims have merit, we necessarily hold the new trial motion was properly denied. A trial court has no discretion to award a new trial where no prejudicial error occurred. (*Ault,* at pp. 1262-1263, 1272, fn. 15.)

DISPOSITION

The judgment is affirmed.  The petition for a writ of habeas corpus is denied.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



ALDRICH, J.


We concur:


KLEIN, P. J.



KITCHING, J.